[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12236

_____

D.C. Docket No. 0:14-cr-60233-JIC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FABIAN WINSTON PARKINSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 27, 2016)

Before WILSON and JULIE CARNES, Circuit Judges, and WOOD,[*] District Judge.

PER CURIAM:

Fabian Winston Parkinson appeals his fifty-seven-month sentence, imposed at the high end of the advisory guideline range, after pleading guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341.  Parkinson was charged in an indictment with eight counts of mail fraud for knowingly causing fraudulent fees to be placed in the mail for the purpose of executing a fraudulent lottery scheme, in violation of 18 U.S.C. § 1341.  Parkinson pleaded guilty to count two of the indictment, in exchange for a dismissal of the remaining counts.

According to the presentence investigation report ("PSI"), from in or about April 2011 through March 2014, Parkinson participated in a scheme to defraud victims by telling them that they had won a large amount of money in a lottery, but that they needed to pay fees before receiving their winnings. Parkinson and his co-schemer then kept the money that the victims mailed to them without paying out any lottery winnings.  The co-schemer contacted elderly victims over the telephone and persuaded them to pay the fees in order to collect their winnings.

---

[*] Honorable Lisa Godbey Wood, United States District Chief Judge for the Southern District of Georgia, sitting by designation.

Victim NG, who was ninety-one years old, was called by an unknown male. NG purchased gift cards, which were used by various Jamaican IP addresses to make online purchases. Parkinson was one of the recipients of the purchases. NG also purchased Green Dot debit cards, but was scolded by the caller, who wanted Green Dot Money Paks instead. The two debit cards were activated online by Parkinson, using his name and address, from an IP address in Florida. NG sent a $9,950 cashier's check to Parkinson, which he deposited into his bank account. NG was called by a magicJack phone number, which also called Parkinson over 200 times between May and October 2013. NG was defrauded of approximately $150,000. Victim NG lived alone and had few remaining friends. She believed that Parkinson and his co-schemer knew her comings and goings and feared that she could not stop sending them money. She was asked to mortgage her condominium, and she took money from an IRA to give to Parkinson, which put her in a higher tax bracket.

Victim SD, who was eighty years old, stated that she mailed $9,900 to "Winston Sabian" after talking to "Mr. Peterson," who instructed her to hide the cash in the pages of a magazine and mail it to Parkinson. SD sent money approximately ten times; was defrauded of over $90,000; and opened a home equity line of credit to continue payments. A magicJack registered to the same person as the one who called victim NG and activated by "Fabian Parkinson's iPAD"

3

called SD 420 times in February and March 2014.   This magicJack also called Parkinson's cell phone fifteen times and received two calls from his cell phone. Victim SD's daughter noted that her mother, now deceased, was a lonely widow and was suffering from pancreatic cancer when contacted as part of the scheme. Parkinson or his co-schemer "befriended" her by representing themselves as an attorney and "fellow Hispanic immigrant" who wanted to help her avoid paying taxes on her winnings.

Victim CL mailed several packages to Parkinson.  She also sent a check to a different victim, BO, which caused BO to believe she was being paid.  CL called Parkinson's two cell phones forty-two times from October 2013 through March 2014.  Victim BO, who was eighty-three years old, mailed Parkinson money orders totaling $2,500 and wired him $2,500.  Victim JS, who was eighty-four years old, mailed a $5,000 personal check to Parkinson.  A search recovered the original envelope from JS and a $5,000 deposit slip from Parkinson's account in Parkinson's closet.  Victim AA, who was eighty-eight years old, was given Parkinson's name and address, and Parkinson deposited a $10,000 cashier's check from her.  From November 26, 2013, through May 26, 2014, AA received 261 calls from the same number that called victim SD.  More than twenty other victims, mostly elderly, were victimized in a similar way.  A composition notebook found in Parkinson's car contained many names with dates of birth and

4

phone numbers, mostly of elderly people.   A "lead list" found on Parkinson's computer also referenced mostly elderly people.

Victims KP and JC were eighty-two and ninety respectively.  Their children had them declared mentally incompetent in order to prevent them from sending more money.  KP's daughter stated that Parkinson and his co-schemer knew when her mother received her monthly checks, and that her mother would go out in snowstorms to send money.  KP's daughter described the callers as "relentless" and noted that her mother's phone number was changed several times by Parkinson and/or a co-schemer to make it more difficult for her family to contact her.  KP was adjudged to be a totally incapacitated person and in the early-to-mid stages of dementia.

Victim LP, who was eighty years old, estimated that she sent between $15,000 and $20,000 in connection with this scheme.  She was hopeful of receiving the lottery winnings so that she could give them to her children and grandchildren when she died.  She would receive a call every month just before she received her Social Security check, and even when she informed the caller that her water and electricity had been turned off, the caller still told her that she needed to send more money.  She stated that the caller made her feel like there was someone who really cared about her.

Postal Inspectors interviewed Parkinson after intercepting a package to

him which contained $9,900 in cash interspersed within a magazine. Parkinson claimed to be in the shipping business and stated that his Jamaican customers sent him payments, but records showed that between April 2011 and March 2014, he received only $4,709 from Jamaica, while he sent $127,894 to Jamaica. A search of Parkinson's room uncovered a magicJack, Western Union receipts, prepaid cards in names other than his, an envelope from victim NG, and a laptop. A search of the laptop found a "lead list," which provided names, telephone numbers, and often addresses and ages of individuals. Several texts on Parkinson's two cell phones contained prepaid card numbers and Western Union money transfer control numbers.

In preparing the PSI, the probation officer calculated a base offense level of seven, under U.S.S.G. § 2B1.1(a). Parkinson received a ten-level enhancement because the loss was more than $120,000 but not more than $200,000, under § 2B1.1(b)(1)(F). He received a two-level enhancement because the offense involved ten or more victims and was committed through mass marketing, under § 2B1.1(b)(2)(A). He received another two-level enhancement because a substantial part of the scheme was committed from outside the United States, under § 2B1.1(b)(10). Finally, he received a two-level enhancement because he knew or should have known that a victim of the offense was vulnerable, under § 3A1.1(b)(1), and two additional levels because the offense

6

involved a large number of vulnerable victims, under § 3A1.1(b)(2). Parkinson received a three-level reduction, under § 3E1.1(a), for clearly demonstrating acceptance of responsibility. These combined to a total offense level of twenty-two. Based on a criminal history category of two, and an adjusted offense level of twenty-two, the guideline range was forty-six to fifty-seven months' imprisonment.

Parkinson filed an objection to the combined four-level vulnerable victim enhancement under § 3A1.1(b)(1)-(2). He argued that age alone was not enough to show "unusual vulnerability." He further argued that even if victims KP, JC, and LP were unusually vulnerable, he did not have personal contact with them and should not have known of their infirmity. He further argued that there were only "a very small number of victims that may be considered to be unusually vulnerable," which would eliminate at least the two-level enhancement for a large number of victims. Parkinson did not object to any of the facts about the victims in the PSI, only to the contention that they were unusually vulnerable for a reason beyond mere age or that he should have known about any infirmity.

At sentencing, the district court heard evidence concerning the applicability of the enhancements under § 3A1.1(b)(1) and (2). After considering the evidence introduced and the parties' arguments, the district court found that the vulnerable

7

victim enhancements applied.  Having received statements from both parties, the PSI, and the § 3553(a) factors, the court noted that "[t]his is one of the most cruel and despicable scams [imaginable.]   Pr[e]ying on the elderly and infirmed is unconscionable.  It shows a person with no conscience."   It stated that it would impose a sentence within the guideline range only because Parkinson pleaded guilty, and sentenced him to fifty-seven months' imprisonment, the top of the guideline range.

"We review de novo the district court's interpretation of the Guidelines and its application of the Guidelines to the facts."  *United States v. Campbell*, 491 F.3d 1306, 1315 (11th Cir. 2007) (internal quotation marks omitted).  "In fraud cases, the repeated targeting of a victim, a practice called 'reloading,' constitutes evidence that the defendant knew the victim was particularly vulnerable to the fraud scheme."  *United States v. Day*, 405 F.3d 1293, 1296 (11th Cir. 2005).  Here, our de novo review of the record confirms that a large number of vulnerable victims were repeatedly subject to fraudulent requests for money by Parkinson or his co-conspirator.  *See id.*; *see also* U.S.S.G. § 1B1.3(a)(1) (for sentencing enhancements, defendant is liable for reasonably foreseeable actions of co-conspirator).  Hence, the record supports the district court's ultimate conclusion that the vulnerable victim enhancements apply.

After reviewing the parties' briefs and the record, and with the benefit of

8

oral argument, we affirm the district court.

**AFFIRMED.**

9